On behalf of the Avalon, Mr. Dino McKnight, and on behalf of the Academy, Mr. Fred LeBlanc. The Rosenwinkel family and Ken Rosenwinkel purchased a 200-acre parcel of land in 1991 with the express intent of operating a cattle farm. In 1992, Mr. Rosenwinkel and his family began operating a cattle farm on the 200-acre parcel of land. Six years later, in 1998, the plaintiffs in this cause, the Toftoys, purchased a piece of land directly across the street from the Rosenwinkels' cattle farm. At the time of this purchase, what was that land being used for? The land was vacant at the time when the Toftoys were purchased. There was a vacant and unoccupied structure on the piece of land that was ultimately purchased and occupied by the Toftoys. Had somebody been living there previously? Somebody had been living there, but they had not resided at that address or in that structure since 1992. We're talking about a farmhouse here? A farmhouse. Somebody was living in the farmhouse at some point, correct? That's correct. And how much acreage altogether was purchased? 1.83 acres was purchased by the Toftoys, and it was subdivided out of a larger parcel that had been used as a farm prior to the date that they had subdivided it out. Was the farm actually being farmed? You know, I don't know whether it was being farmed or not, but under the circumstances, the structure that was on the farm was not being used for the purposes of furthering the efforts of farming or to house, what I'll say, either farm workers or a family that was operating that farm. When did the horses arrive on the property? The horses arrived sometime before 1991, according to the testimony that was provided in the trial court. And were they on the 1.83 acres, or were they on part of the other acreage? I believe that they were on part of the other acreage, and they were in a barn or an outbuilding that was ultimately part of a parcel that was separated from the 1.83 acres. And would the breeding or care of horses consider management of livestock? I don't know whether breeding or care of horses would be considered management of livestock, but under the circumstances, it certainly would be a, what I will say, an activity on the land. I don't know whether it's a farming activity, and I guess it depends upon the use of the horses under those circumstances. My understanding that those horses were primarily used as recreational animals that were ridden occasionally. And I don't think later on that they were even ridden. They're sort of boarded there. And the numbers have changed from one or two horses from the late 80s up until, I think, most recently when the trial was held. So your clients bought the acreage, the 1.3 acres. They tore down the farmhouse and built a residence. Not my clients. My clients purchased the 200-acre cattle farm across the street. The plaintiffs in this cause, the Toftoys, purchased the 1.83 acres. You said before they just purchased acreage. Was it a cattle farm before or was it not? My clients who purchased the 200-acre parcel purchased with the intent to operate a cattle farm. It had been previously historically used as a cattle farm as well. Okay. After the 1998 purchase of the 1.83 acres that was made by the Toftoys, the plaintiffs' faction, they then constructed a new structure on the 1.83 acres, which is a single-family home for residential purposes. It was subdivided into this 1.83 acres, and they built their new house in 2004. Wait a second. Again, you said before that it was subdivided prior to them building the house. Now, was it before or after? They purchased the land in 1998. Okay. And immediately began construction of a home. The home took seven years to construct and was not given an occupancy permit until 2004. Okay. And then in 2004, they moved in after having received an occupancy permit for the new structure that was located on the 1.83 acres. And that same year, they filed suit against the Rosenwinkles, alleging a nuisance. That lawsuit was ultimately non-suited, and this lawsuit was filed in 2007, which resulted in the trial of this cause. And which brings us to the primary issue here is whether or not the Illinois Farm Nuisance Suit Act applies to this case. And if the Illinois Farm Nuisance Suit Act doesn't apply to my clients, I don't see how under any circumstances it would apply to anyone in this situation. All right. So you're saying the Rosenwinkles, when they started the cattle farm, there was nobody living on the property. There was nobody living across the street from them. It was abandoned. It was abandoned. It was a vacant building. But it was clearly a house. There was a house, but the house was ultimately demolished. And the testimony in the trial court by Mrs. Toftoy was that it was not a suitable residence for her to move into. Nonetheless, it looked like a house. It acted like a house. It just no one was living there. Actually, it looked like a house, but it did not act like a house because nobody was using it as a house to reside there. So your client's position is, look, what did we do wrong? You have this cattle farm we started. There's nobody even on the property at the time that we purchased the cattle farm. We're minding our own business. We're running our cattle farm. The next thing you know, somebody builds a residence, and now we're out. We have a problem. That's correct. Okay, but picking up on what Justice Jorgenson said, do we get into an issue of form over substance? What about if somebody was living in the farmhouse, and then your clients started this cattle farm with the alleged fly problem? Wouldn't the result have been different? No, the result would not have been different under those circumstances because the land was subdivided into a nonconforming use. So under the circumstances, under the Kendall County Zoning Ordinances, you can only build a new structure on 40-acre parcels. What the plaintiffs did is they subdivided and represented in their building permit to the Kendall County Zoning Commission that they were the owners of the land and that they were going to subdivide it or they were going to build a new structure. And then ultimately what happened was they weren't the owners of the land when they applied for the permit. The property was then subdivided, and they constructed their house. So this situation is the result of a subdivision of the land and by the transfer of the ownership of the land. So under the statute, it says any change conditions come after a farm has been in operation for a year, the result in a claim of nuisance is barred. So you're saying that the plaintiffs subdivided the land subsequent to the commencement of the operation of the cattle farm by your clients, and this is now a nonconforming use that the plaintiffs have? Because it's 1.83 acres in an agricultural zone for Kendall County. And so under those circumstances, there is a nonconforming use because it's residential in nature. It's a nonconforming use because it's 1.83 acres. It's a nonconforming use because they built a new structure there on 1.83 acres when the existing parcel was not, they were not the owner of the existing larger parcel that exceeded 40 acres. Okay, but when, assuming that the house is there and they, and it was when they purchased it, and instead of demolishing it, they put an addition on. Well, if they changed the use, which would be occupancy of the land, that's a change condition of the land. Because the statutory language in the legislature designed the statute to protect farmers, and they used the term any. They didn't say some change conditions, some change circumstances. They said any conditions that result in a claim of nuisance against an operating farm. And under these circumstances, that would be a change circumstance. Well, so you're saying, so let's assume the farmhouse had been abandoned, same scenario. Somebody moves into the farmhouse and puts a room addition on. Correct. Under your interpretation, that's a change to invoke the statute. That is a change to invoke the statute, particularly when the house had not been occupied for an extended period of time, because it had not been occupied for more than six years. And that's between the time when the farm started, meaning the cattle farm started. So when the cattle farm started, there was no one living across the street, the property was not occupied, and it remained unoccupied for six years, and then it would subsequently be occupied. And under those circumstances, that's a change condition. The fact of occupancy alone changes everything. That's correct. That's your change condition? No, that's not my change condition only. That's one of my change conditions. In addition, the change condition is the actual subdivision of the land. And so under those circumstances, if we look forward to other potential situations like this, you can have people subdividing lands, and the argument would be, well, I'm going to do a historical analysis of what the land is used for. So under those circumstances, say, well, I divided it into five-acre plots, but I know for a fact that this land has been used in the past historically for someone to live here, so that completely subverts the purpose of the statute because it's a retrospective analysis of the use of the land. Whereas the statute requires you to do a historical analysis. What would not be a change in circumstance under your analysis? If someone had occupied the land the entire time in the same structure and had not subdivided the land, and they complained about a farm that came to them afterwards, and they had been residing there throughout the entire time, that would not be a change in circumstance. So basically the owners of the land under your scenario, the property has to remain unoccupied forever, according to you? No, it doesn't have to remain unoccupied. It doesn't? You just have to say it. The mere fact of occupancy involves the provisions of the Act, according to you. But it doesn't affect their occupancy. They can occupy the land. They just can't sue for nuisance once the land has gone empty and there's nobody occupying it and they changed it. Right. So if somebody moves in there, doesn't change the structure at all, they're without any remedy to a nuisance next door, according to you? If the nuisance does not arise out of negligence. Because the statute specifically provides that if a farm or if another activity is going on in the area with respect to farming, and it's done in an improper manner, a negligent manner, they certainly can proceed and nuisance against it. So let's assume there's no negligence then. It has to remain unoccupied. Nobody could ever move into the residence under your scenario. Well, no. Because that's a change, you said. Right. No one could move in and sue. They can move in if they want to live there and put up with the typical uses that are going on with an agricultural area, including a cattle farm across the street. But if you want to move there after it's been unoccupied for this many period of years, and I might add, if you want to subdivide it, purchase a new piece of land, build a new house. But you're adding facts onto this. Yeah, but that's the facts that are the case that are present in the case. And so under the circumstances, what we have in the case is the subdivision of land, the demolition of a structure, the construction of a new building, and then the occupancy of the land, which results in the creation of this complaint for the nuisance. But sometime after, I'm suspecting based upon our conversation here, after the 2004 suit was filed and non-suited, but before the 2007 suit was filed, the Toftoys acquired another 60 acres. I don't know when they acquired it, and I don't think that's in the record. But they did acquire 60 acres. They did, but it was a separate parcel, and it remains a separate parcel, and it was a separate parcel throughout the period of time, including at the date of trial. So the problem with that is that subsequently, if the Toftoys choose to move from the 1.83 acres, that could be used for residential use. In fact, that's what it's taxed as, and that's what the record shows. It's also zoned all agricultural, though, is it? It is zoned all agricultural, but it's taxed as a residential piece of property. Which trumps? I would think under the circumstances, the taxes trump because it's also a non-conforming plot because it's 1.83 acres when it should be a 40-acre plot under those circumstances. And all of this, I might add, happened after the date that my clients began the operation of their farm. Did the trial court ever reach the issue of negligence in this case? It did. The trial court granted a motion in limine, barring any discussion of negligence, because the court said that there was no evidence of negligence that had been produced. So when the court – They produced when? At any point during the course of the discovery. Okay. And the court granted the motion in limine saying that there would be no discussion of negligence, and, in fact, that order was granted and enforced during the course of the trial. So, in essence, the court's already made that finding. The court has made that finding. That's correct. And the court has found that there is no evidence of negligence, and, in fact, there is no evidence of negligence that was presented to the court at all. And under those circumstances, the act absolutely applies. So we have a situation where we have – there's been a change condition. And, as I described, the change conditions are the occupancy, the subdivision, the construction, the demolition, and then the ultimate use of the property by the Toff Toys. And then, on top of that, there is no evidence of improper or negligent conduct on the part of my clients. So now we're in analysis of whether or not the statute applies, and there seems to be no reason why the statute wouldn't apply in those circumstances, and that's where the trial court erred. But the court did make some findings about substantial harm and one other issue, and I can't remember what it was, which then led to the injunction, correct? That's correct. The court found that there was a substantial harm, but we believe the court erred in that circumstance because, in doing an analysis with respect to whether or not there's a substantial harm, first of all, analysis must begin with where the properties are located. And the first analysis is, is this the appropriate area for this to be located? And the concept behind that idea is that you can't have somebody move to an agricultural area, complain about agricultural activities, and then sue a nuisance because that's inherent in the concept of substantial harm. But Mr. Toff Toy, the younger, Roger, I think is his name, he did farm some of that acreage with his father, correct? He did. And is it still, well, was it farmed at the time of the trial? I think some of it was farmed at the time of the trial. But not the 1.83 acres where the house is? That's correct. And the statute doesn't provide an exception for that. The statute doesn't say we're going to protect in situations where we have a legacy or a promise from a family member. The statute says any changed condition. So under the circumstances, the Farm Nuisance Suit Act should apply. And it doesn't matter that it's going to be transferred on a promise from one person to the next. What matters is whether or not there's any changed condition. But you can understand that, let's say that they put up a new barn. The Toff Toys put up a new barn. It's been agricultural. And now they complain. I mean, is there a provision in this statute where a court should weigh which farm is more important? Or are they both farms? And therefore we don't have a lawsuit. Well, I think you don't have a lawsuit. Because I think you can't come to an area where there's been an existing farm. And the legislative history of this act, and I might add the preamble to the act, is explicit. The idea is to protect farmland. It's to protect farmers. It's to protect the finite resource that is farmland. It doesn't have an exception. And specifically states in legislative history, they say you can't move to an area and then complain about what's going on in the area when it's appropriately being farmed. Well, the flies wouldn't hurt the farmland, per se. They would hurt the farmer. So the farmer, if this was on the other side, if they were farming on the Toftai property. So it doesn't make any difference if the farmer is being harmed? It doesn't make any difference if the farmer is being harmed when he's being harmed in his residential capacity to use it because that's the changed condition. Because if you just want to treat it as two farms across from each other that continue to operate over a period of time, the statute would not apply because there would not be a changed condition. And that's the difference. There's a distinct difference between two separate farms operating here across the street from each other than what happened in our case. In our case, we had a change in ownership, the subdivision, construction, demolition of a building. So the people that move in to the residence or the people that move in to the adjacent property are not totally without remedy under the law if, in fact, there's negligence. That's exactly right. But the very fact they moved in doesn't give them the right, you're saying, to maintain it? That's exactly right. And if you move in and you can't prove negligence on behalf of the adjoining or adjacent pieces of property, then you don't have a cause of action in nuisance. And that's what the circumstances are. I might add that with respect to this specific case, Judge Abramson, the trial court judge, also applied a similar analysis in applying there's a five-factor test in the Woods v. Conn decision. And you get to the third factor under Woods v. Conn, and Judge Abramson said, well, essentially, it's the argument who came first. And she found that the Toftoys were there first, and again, based upon this concept of legacy, the concept of promises through family. But in reality, the Toftoys, the parties that are the plaintiffs in this suit, came afterwards. They came after my clients had been in operation for more than six years. Isn't that part of the statute? The purpose of the statute, though, is to protect all farmers, not one farmer over another? I think it's to protect all farmers, absolutely. But it's to protect from farmland being taken out of use for its intended purpose. So whether it's a farmer that moves across the street, a suburban household, an apartment building, restaurant, daycare center, whatever you want to do, whoever moves across the street, if they want to sue and nuisance, they're going to have to show that somebody did something negligent or improper. But who lives across the street is another farmer. Correct. Why doesn't the statute protect them? But there's no allegations in this case that the farming operations across the street are being impacted. The only thing that's being impacted across the street is the residential use of a 1.83 parcel of property. So, again, it does not protect people. It only protects corn and livestock. It could potentially protect people if it interferes with their operation of their farm. But in that case, this is... What about, I can't live here, so I can't farm here? Well, potentially that could be a result of... It could protect them. But you're going to, again, I think based upon the express language of the statute, you're going to have to show that somebody across the street was doing something wrong, something negligent or improper. Because you go back and keep saying that this is a changing condition. That's exactly right. At the time your clients moved in, there was clearly a house in plain sight across the street, correct? That's correct. Okay. Anything else? Did you have any other questions? No. You'll have a chance for reply. Thanks. Sure. Counsel, did you wish to argue? No. Good morning. Fred Roth, representing Roger and Bobby Toftoy. The plaintiffs, individually on behalf of their children, Natalie and Haley Toftoy. Counsel, Justices. Mr. Roth, what about the subdivision of the property? The house was gifted by Clarence Toftoy to Roger and Bobby Toftoy. It was not purchased. Okay. It was part of a plan of gifting where they gifted the house first, and then they gifted 58 acres in 2002 to the Toftoys. Did they give the house and 1.83 acres? Or did they give the whole 60 acres with the house coming first? Let's get the chronology, please. In 1967, Clarence Toftoy, my client Roger's father, in 1967 he bought the farm. It was about 120 acres. In the middle of the farm was the farmhouse and the farm buildings. Since 1967, Roger Toftoy has farmed with his father that property. In 1989, Roger and Bobby Toftoy began housing, boarding their horses within the out barns and the small pasture riding area right next to the house. That was in 1989. Does the breeding or management of horses constitute livestock? Sure. Or an agricultural use? Absolutely. If you go to a town and want to have a horse, it's going to be considered an agricultural use. If it's not zoned for agricultural use, you can't have the horse. It was absolutely an agricultural use to have the horses there, to farm the outlying property and to use the farm buildings and the riding area that's right next to the house. In 1991, the house was being rented to a Debbie Slatton and her husband and child. Her husband died in a farm accident. She later decided to move somewhere else from the house. It was at that point that the Clarence Toftoy, Roger and Bobby Toftoy decided that Clarence was good about wanting to gift the property to Roger and Bobby and they wanted to make it their home. They did an analysis of the house and as was testimony in the case, it was going to cost too much to remodel it given its age and it would be better just to demolish it and build a new house on the very same foundation, the very same location. That didn't ultimately get started until 1997 with demolishing the house. It was actually deeded over in 1998 and the deed had a number of restrictions that if they ever wanted to sell, the father who wanted to keep this as a family operation. At that point, how many acres have been deeded to the children? How many acres? 1.8, which encompassed the driveway and the house itself and some of the acreage where they would ride the horses. It was a fenced in area. So they did not subdivide? Well, the deed conveyed 1.8 acres and because it was by gift and with its historical significance, Tyndall County had no problem with that being deeded just as that piece. This concept of subdividing sounds like something in a suburban subdivision thing where you're going to break it up into all kinds of parcels. This was just transferring the house so that it would become Roger and Bobby Toftoy's residence as it was being— By the gift, subdivided essentially. As a gift, right. But when they applied for the permit to build the house, what did they list at—what were they building the house on? They were building on the same foundation where the old house was. Did Tyndall County—you said Tyndall County didn't have any problems with it. Did Tyndall County know it was 1.83 acres as opposed to 120 acres? As far as I know, they did. Now, this concept of you can't subdivide, you can make one subdivision for less than 40 acres within a 120-acre tract. And that's what they were doing here. They made that one subdivision and then they could—next time, they've got to be more than five acres. What about your opposing counsel's argument that now, when it was all said and done, it constituted a nonconforming use? Well, whether it had a nonconforming use or it didn't have a nonconforming use from a taxing standpoint, it was always agriculture. Today it's agriculture. Before it was agriculture. It's still agricultural use. To say that it's a nonconforming use— I mean, the residence is a nonconforming use. Did that change from the farmhouse to what is now there today? No. It was a farmhouse used as a farmhouse, used as a residence for people living in the country by the Slattons and by prior owners. And it also was used the same way by the Toftoys that lived right there in the same place. Same foundation. In your opposing counsel's brief, he says that the plaintiffs admit that it is a nonagricult—the house is a nonagricultural use. Is that true? I would put this in the category of form over substance. I grew up on a farm. I wouldn't say that the house I grew up in was nonconforming or that somehow— I won't call it nonconforming, but he said nonagricultural use. Nonagricultural. Walk outside and there's where we raised the pigs and there's where we had the chickens and that's where our farm equipments were. That was our farming operation. When Mr. Toftoy goes out the back of his house through the garage or otherwise, he's on the farm that he's part farmer of and now has 60 acres approximately that's his alone that he farms. To divorce those two or to say there's some difference between the farmhouse and the people occupying it, that that's some kind of a changed condition, makes no sense in an agricultural community. What about breaking it down to its simplest terms? Your opponent has an argument that when the defendants commenced operations of the farm, bought the property and commenced the cattle operation, there was nobody next door to complain about anything. Correct? Not true. The place was leased, and this is in the record in 167, by the former tenant, Debbie Slatton, who moved out of the farmhouse in March of 1992. They purchased the property across the street in 1991 and it was vacant. There was no one in the house. There was no farming operation going on as far as cattle was concerned. So when they purchased it, there was someone living there. Slatton was living there? Yes. In 1992. They purchased in 1991. They knew there was a house there. They knew there was an occupant. Okay. When they began the farming operation, the cattle operation. Right. Which for the first year was eight or ten cows. Okay. But they, how do I want to put this, they operated the cattle operation for more than one year before the house was reoccupied. Or the new house was built. They started their eight or ten cows on the operation in 1992. It was still occupied in 1992. But that person vacated. Then they continued their cattle operation. It was in 1992 that my clients, Roger and Bobby Toftoy, began analyzing whether we're going to remodel this house or we're going to just tear it down and put up a new house. This is important to pin down. So you are saying clearly that somebody was occupying the farmhouse when they began the cattle operation? Is that what you're saying? That's what I'm saying. Okay. They began, they purchased in 91. They started in 92, and in 92 there was a person in that residence. It was a smaller operation, but nevertheless they had commenced the cattle operation when the Slattons were living there? Correct. I don't know the date of Mr. Slatton's demise from a farming operation that he was involved in, but Debbie Slatton was there until the middle part of 1992 with her child. But what about tearing down the farmhouse? Let's assume that that's true so far. It sort of undercuts the argument that, hey, wait a minute, nobody was there when we started. We thought it was free and clear. There's no neighbor to complain. Now we're getting a different picture. What about his argument, though, they tear down the farmhouse and put up a different structure? Is that a change in the property that triggers the statute? I agree with Judge Abramson, who's heard all of the factual details. When she said there was a house there and there's a house there, it's virtually on the same foundation. It was just a matter of the age of the house and its structure and the costs that would be incurred by my clients if they made the decision to tear that one down and put a new one up. She mentioned in her findings, Judge Abramson, that if it had been torn down as a house and built as an apartment, not an apartment but a bed and breakfast, she called it, type of facility, where you change the actual what's going to happen as far as traffic or people or visitors or sensitivities of people like that that might come there for a different purpose rather than agriculture or to live there as your home and be a family farmer, as my clients were. That may have been a changed condition. Her interpretation of the Act, which is our interpretation of the Act, is that if someone comes to a rural area and sets up a change from what was there, what was going on there and what that's all about, to drive through a rural area and see a farmhouse on a farm and people are living there and then later there's different people living there or they tore down the old one and put up a new one, single family house, I don't see that as any kind of changed condition. Judge Aprimson's trial clearly establishes that somebody was occupying the old farmhouse when they commenced the cattle operations again, correct? Correct. This is a key point for obvious reasons. Correct. And it was a key point to Judge Aprimson and it's on the record 167 as far as the move out by the tenant Debbie Slatton in 1992, which was after 1991 and after they brought in the first 8 or 10 cows. Mr. McKnight says that, okay, now we have, taking these facts that you're now giving us, we have two farmers living across the street from each other or two agricultural purposes living across the street because we're not talking about the farmers, we're talking about the land essentially. Okay. We're not going to now take out what we won't prevent the lawsuit by virtue of non-farmland. I mean, we've got farmland. But now we have to prove negligence or some wrongdoing. Well, we have to prove nuisance, which we did. But what he's saying is if you say the Farm Nuisance Act applies, if you say there is a changed condition, it has within the Act that it talks about when such farm was not a nuisance at the time it began, that's when they started the 8 or 10 cows for the first year, provided that the provisions of this section shall not apply whenever a nuisance results from negligent or improper operation. There is no standard of care regarding pest control of a livestock operation in the state of Illinois. But the judge did find by motion in limine that there would be no issue about negligence, which is incorporated in the statute, and therefore there wasn't any testimony about negligence. There might have been testimony about nuisance, but let's go to negligence. Right. We didn't claim negligence because there is no standard of care for pest management of livestock animals in the state of Illinois. So you can't prove it. You can't establish it. You can't establish negligence. It was a carefully drafted Act that was voice vote approved by our legislature on a late night, back when it was approved. But there was discussion about it. There's less than a page of discussion about the importance of agriculture. That's all there is on the Act. Is it your point, then, that there is no plaintiff can ever prove negligence because there is no standard? Sure. That's your point. We had the guy who's the preeminent one of seven or eight in the country, livestock entomologist, who just came out with a new book before the trial. He told us when he came out there are no standards of care regarding this issue, regarding pest control, as to the issue of negligence. As a consequence, you couldn't come to court and say they breached their duty of care because there is no standard. That was our problem. But there was? Yes. Go ahead. So, in essence, their position has to be, then, your case stands or falls on a statutory interpretation as to what is meant by the phrase change condition in the area. Right? Well, it does, in a way, because the words are improper use. I'm not really sure what that means, or improper use. Does that mean that you're doing some activity or you're doing an activity improperly? Because the court clearly found that the unbelievable number of stable flies that were infesting our property from their property, that that was clearly substantial. That was clearly intentional because they knew stable flies could come from this kind of operation. They had put on guard about it. I mean, we went out there and did an inspection that was prearranged, meaning they could have it spick and span because they wanted. But we still found evidence and produced it to the court of active fly breeding sites that they didn't recognize. Now it's irrelevant because there are no standards of food negligence. Negligence is off the table. I thought you just ignored it. Exactly. But improper use is within the statute. And the question is, if they were using it to create a nuisance on us, I would call that intentional, substantial invasion under the facts that we have in this case. Is there any evidence of that? We brought in and laid out 14,000 flies on fly traps. We had an expert witness that the judge found was credible and not biased that testified about all of this. We testified about pest control and shutting down breeding sites. Their expert, Dr. McKenna, a veterinarian, testified about pest control with regard to the animals themselves, not necessarily with regard to what's flying off the property. But as a result of the injunction, which by its terms is pretty broad, what did the judge tell them to do? In simple terms, clean it up, break the cycle of active fly breeding by cleaning up your operation. If you put it in the simplest terms. But your own expert said that you could never eliminate them. Absolutely. You could never go down to zero. But to have 5,700 flies caught on fly traps in your front yard in seven days in August of 2007, that is more than a few. The wind was blowing in your direction. If it wasn't blowing in your direction, that may not have happened. The expert testified that these flies would go usually no more than a quarter of a mile. We're within a few hundred feet of the operation where it was based. We're not asking for zero, expecting zero. We wouldn't expect the court to impose any such zero tolerance with regard to the situation. But this is not the typical. This is way beyond anything. Well, what number would be appropriate? I mean, you're saying zero is obviously recognized. You're not going to eliminate flies in the world. It doesn't matter what you do on your catwalk. I agree. 5,700 seems excessive. So what amounts would be appropriate? Can you answer that question? Unfortunately, there are no standards to point to. The only standards there are, which we did point to and have testimony on by Dr. Williams, is regarding the animals. And 20 or more is considered on the feet and the legs of the animals to be an irritation that will actually affect the weight gain for the cattle. Well, these are blood-sucking flies. These aren't just fly around your head, land, and go back to the window or something kind of flies. These suck blood. These attach. That's the way they're made. Their expert, Dr. McKenna, couldn't even identify what one looked like when he was asked that question, even though we had 14,000 laying in front of the court on the part of the court. So if you had your truthers, what are you asking the Rosenwinters to do? Cut down on the cattle, cut down on the flies, both? What are you asking them to do? There's no reason for an operation of this size of a couple hundred cows that they can't keep it cleaned up enough that they break the cycle of active breeding so that we don't have a problem. That's all we're asking. And the court considered, because we tried to come up with a number, we suggested numbers to the court, and the court said, I'm not going to go in the direction of limiting a number, and the dog marking case, the dogs case that I mentioned where the court did say this is how many dogs you can keep and everyone else has to leave, the court here said, I'm concerned about going to the source, stopping this at the source, understanding what testimony I've heard from Dr. Williams about the fly breeding cycle from egg to larva to fly. It's about a 14-day cycle. Break that cycle. You don't have the problems. These are clean, the barns and the feeding areas and the vegetative areas so that you don't create the problem. That's what it's about. Can that be done in a non-containment area, according to Dr. Knight? I would say not in that domain, Dr. Williams. I apologize. His testimony all focused on around their barns and sheds and feeders and vegetation areas. When I say vegetation, it's where there's feed, it's where there could be manure, there could be a mixture of things, and moisture. That's the breeding site. Eliminate that area on a regular basis and you break their cycles and they never get into these swarms of flies that we experienced. That's what she was trying to do in her injunction. Counsel, in a nutshell, what is it that you're asking us to do? I'm asking you to affirm Judge Abramson's findings and her opinions and her ruling because I think she took a tremendous amount of time to listen to everything. It was a bench trial. She had all the transcripts that she reviewed. It took about 30, 40 days, and she gave, and I attached it as Exhibit A to my police brief, is all of her findings. She went through all the evidence that she thought was important and what it was. If you have the time to read that, that tells you exactly what she was thinking and what she determined, and I think she was right on in understanding and trying to resolve this issue in the least intrusive way possible as far as their operation. She's not saying they have to shut down. She's not saying that they have to get rid of cows. She's simply saying you have to manage this pest control problem differently or better and use someone that's got some expertise to help you. Perhaps I asked you a too broad a question. Okay. I guess my specific question is how does the defendant know when they have complied? I mean, how do they know that this is an okay amount of flies? We all agree it's never going to be zero. Right. So what is the remedy? What is it that is sufficient? It is a tough criteria because it's a matter of what is annoying to a reasonable person. And, again, that can be subjective. And that can be very subjective. Example, they wanted to point the finger at our horse operation, but they never came over to inspect. They didn't do anything to check it out. Our expert did. He testified on that. We asked them, why don't you put some fly traps, which cost a few dollars, less than $25, to put out some fly traps on your operation to get a measure of what's going on. They say, we don't have to do that. We aren't required to do it. We're not going to do it. So they didn't do that. When it comes to the inspections that the court ordered by someone who knows what they're looking for, it was to somewhat educate them. Todd Ayers, their herdsman, their guy in charge of this, he admitted some of the pictures we took were problems. Others, where there were active fly larvae in the picture, he couldn't see what the problem was. And so it was a part of an educational process to bring that to bear. So there was some attempt to resolve it amicably and it broke down for lack of a better term. Absolutely. Absolutely there were. That's all we're interested in. We're not interested in them stopping farming, putting them out of business or anything of that nature. This isn't threatening the agriculture industry in Illinois. This is a simple situation where with a little more knowledge and understanding and training and applying it, you can get this down to a reasonable level. So reasonable. And then, I mean, you dance around it. I'd love to say it's 200 flies within a certain time period on a certain day and during fly season. Is part of the remedy imposed here that there be some ongoing check? That is within the court's injunctive order. In the first year of 2010, it was to make these inspections. Depending on what the inspections showed, they wouldn't have to do it as frequently. There's only a certain season of May to November that's the operative season for this, and it's usually July, August, and September that is the most critical. This isn't like something they have to change every week. This is only during a certain season when all of this is there. And the court said in its injunction at the end of that, after 2010, is that thereafter they would continue to shall have a continuing obligation to maintain their cattle confinement and hay bale storage areas free from potential inactive breeding sites for stable flocks. That's what she ultimately came to. If there's a problem, we're going to notify them. If they don't want to do something about it, then we don't have any option but to come to the court. Okay. Any other additional questions? No, I don't. Okay. Thank you very much. Thank you. Counsel, somewhere, not to preempt your beginning argument, I think we can agree this is a critical issue. Your opposing counsel is adamant that when your clients commenced a cattle operation, somebody was, in fact, living on that other piece of property in the farmhouse. I disagree. How is that not clear in the record? It is clear in the record, and the record reflects that my client purchased the land in 1991 and then began their cattle operations in 1992. The record actually has two dates with respect to when Ms. Slatton left, and it is December of 1991, and then there was another date that was cited by counsel, which was March of 2004. But regardless, all of the cattle operations began after that, excuse me, March of 1992. I apologize. So the purchase of the property was in 91. The first date that's in the record with respect to Ms. Slatton leaving is December of 1991. There's another date mentioned, which is March of 1992, and the cattle operations didn't begin until later in 1992 after Ms. Slatton had left. So under those circumstances, I don't agree. Well, did the court make any finding as to whether or not somebody was occupying the farmhouse when the cattle operations commenced? I don't believe the court did make that finding, and I think under the circumstances, I don't think it matters anyway because I think regardless, as I described earlier, there's been a changed condition, and the occupancy and the vacating of the premises and then tearing it down are changed conditions. But regardless, there's also this discussion about the ownership of the property somehow beginning in 1992 when Ms. Slatton left. But in reality, the property is specifically deeded from Clarence Toftoy to the plaintiffs, and I think it's either Roger Toftoy or Roger Toftoy on this record. But to give you an indication of the specificity of that deed, this wasn't ad hoc. It wasn't off the cuff. Clarence Toftoy reserved and preserved his right to gain access to the outbuildings that surrounded the residence that was being deeded to the plaintiffs in this case. And the reason why that's important is that's important because that contemplates a potential sale of the 1.83 acres to somebody else, but Mr. Clarence Toftoy wanted to continue to use that land for his farming operations. And in reality, whether Roger Toftoy helps him out or not, Roger Toftoy isn't the person that's farming that land. It's Clarence Toftoy. And I might add the record also reflects that Roger Toftoy throughout this entire period was a heavy equipment operator. That's his primary source of income. That's primarily what he does when he gets up in the morning. That's primarily where he goes to work as a heavy equipment operator, not as a farmer. He helped his father farm on occasions, but in reality what he was was a heavy equipment operator who came to this and he bought a house and built a house across from a cattle farm. And at the end of the day, those are what the circumstances are around this purchase. And that purchase didn't occur or that deeding didn't occur until 1998, after the property had been vacant and unoccupied for six years. The court also brought up an interesting question with respect to what is enough. We don't know. This order that's entered by Judge Abramson gives no guidance whatsoever as to what's enough. And we are respectfully sitting underneath the Damocles sword of another potential lawsuit by these people based upon what they believe is a subjective or an improper model. Isn't that kind of the nature of the beast with nuisance? That is the nature of the beast, and that's exactly why the statute was adopted. To protect farmland and farmers from this exact type of situation where we're faced with relentless lawsuits over and over again arising out of activities. And I will tell, if you listen to what counsel said, there was no evidence here of negligence. There was no evidence of improper conduct. There is no evidence of any kind that way. They didn't offer anything. But there was evidence that the people were annoyed. Was it one day that Mr. Roger Toftoy went out and his back was covered with flies? Yes, there was evidence of that. That's pretty annoying. That's annoying, but that's not improper operation of a farm. And so what this – Well, improper conduct. It's our job to try to figure out what that means. I don't know that that means operation of – Well, but that's – it's not conduct. That's an important thing. That's what I was going to bring up. Okay. Counsel says – it says negligent or improper operation in the statute of any farm or its appurtenances. And the nuisance action is based upon improper operation of the farm. There is no evidence in this case – Well, but that's what they brought it on. No, I think they did bring it on improper operation, but they produced no evidence under the court rule that there was no improper operation. Counsel, let me ask you a point of question. Obviously, you're asking us to reverse the trial court and find that the Farm Nuisance Act should apply. That's correct. But you've also said, hey, we also have another problem. In addition to the fact that we think that the court erred in applying – not applying the Farm Nuisance Act, they have this injunction that's way too unrealistic and too broad. That's correct. So if you – if we were to uphold the finding that the Farm Nuisance Act for whatever reason didn't apply, I'm not saying we are or not, is there something else you are suggesting with regard to the scope of the injunction? Do you have a fallback position here? The injunction is entirely improper because it's impossible to comply with. Because by the very nature of the testimony that was offered by the plaintiff's expert, Mr. Williams, every single farming operation anywhere in the United States is a potential breeding site for flies. And the specific language of this order in this case says eliminate a potential breeding site for flies. That essentially eliminates the operation of this farm. And so we're under a circumstance here where we've got a farm that is being managed by a judge. That's what we have. We have a farm being managed by a judge, and then we're subject to no standards whatsoever, zero standards whatsoever as to what is acceptable and not acceptable other than the whims of the plaintiffs and the potential ruling of a trial judge that sits out there with no guidance whatsoever. And I will say – It doesn't say control. It says eliminate, correct? Eliminate. Yeah, but it specifically says eliminate potential breeding sites. And under those circumstances, a bale of hay sitting – Could give rise to a breeding site. A breeding site. I'm in violation of the order. Well, as I said before, under the facts of this case, what short of a containment operation could accomplish that? I don't know, and that's not my obligation. My obligation as the defendant in this case is if they wanted to bring those issues, they had an opportunity to bring those issues to the trial court. They had an opportunity to go out and do an investigation of what they did and provide testimony of that. That's not my obligation. The only evidence that's before the court now and before the trial court was that my clients properly operated a farm. The testimony of our veterinary says it was properly operated. The testimony of Mr. Rosenwinkel says it was properly operated. And there was no testimony. In fact, when the questions were presented both to the plaintiffs as well as to the plaintiff's expert, there was no testimony regarding improper operation or negligence. In fact, they couldn't tell you anything because they weren't there and they don't know. And they had an opportunity to inspect and go on to the farm. And I might add that despite this, what we'll call these subjective standards, there is explicit and particular testimony in the trial about what an appropriate number of flies would be with respect that the Toftoys could tolerate. And Mr. Toftoy said none, zero. Mrs. Toftoy said, what would be an appropriate number that would be around your house? She says none, zero. We're already setting up a situation where my clients can meet a completely unreasonable standard. And they have no way of complying short of shutting down their operation. And they're in the record reflect it's been sent to the appellate court. There's already been efforts been made to hold my clients in contempt for violation of the order. It's not part of our record, is it? It is part of the record. Since? Since. Last year? Since last year. And the problem with this injunctive relief is it provides us with the lack of specificity that's required under the Illinois Code of Civil Procedure. We don't have specificity. Did you ask for any specificity in your remedy before this court? I don't ask for that. I don't ask for that because there's nothing to go on. At the appellate level, we can't sit here and make up evidence as to what the specificity should be. Because there's no evidence to provide the court as to what a proper operation, what proper remedies would be. And, in fact, if you look closely at the record, Judge Abramson, she's in a quandary. When she does her ruling, she suggests to the counsel that we take the case under advisement and then have additional evidence heard on that issue. And the defendants and myself came and said, we've had a trial. We had disclosures pursuant to Illinois Supreme Court Rule 213. We had discovery depositions of all the parties involved, including the experts. And under the circumstances, going back again and reopening the cases for the purposes of adding additional evidences so they can craft a damage relief is entirely inappropriate. What about if the injunction said take reasonable steps to control the fight problem as opposed to eliminate all of it? Would that have been a reasonable position to take? I think it is because we don't know what that means. And the court doesn't provide us with what that means. And so under the circumstances, again, that doesn't give me any guidance as a farm operator or as a person working on a farm as to what reasonable means. Isn't reasonable used in other legal contexts? Reasonable is used in other legal contexts. So why can't a trial judge determine under abuse of discretion what's reasonable and what isn't? Because under this circumstance, it's in the context of nuisance. And so we're subject to the subjective whims of the plaintiffs in this case. And so what reasonable is to the court? You're not really totally subjected to the plaintiff's whims, are you? I am because under the circumstances, if the injunction, if they come and say they're not being reasonable, I'm faced with another court action. I'm faced with another action to enforce the injunction because the plaintiffs across the street don't like what's being done. And they want to articulate a standard. And I think that's the purpose of injunctive relief, is to provide specificity so that persons know how to engage in specific conduct that the court is either enjoining or requiring to be done. And simply to say being reasonable doesn't provide the same. And I would add, if it's just to be reasonable, under the law, you're obligated to be reasonable anyway.  And neither of you at the trial court level, when this problem of what the injunction might be, really wanted to reopen evidence, did you? I don't. I absolutely did not want to. I mean, I was looking at the transcript. It doesn't look like either one of you were really interested in that. I don't think that there was any request following that that the evidence be reopened. Because I think everybody understood that after three years or two years of litigation and extensive discovery, that we were done. We had had a trial. And the request for a preliminary injunction had merged into a request for a permanent injunction, which was what was entered in this case. And for that reason. Anything else? Any closing remarks? Other than asking for the relief of the question whether the matter be reversed and that the finding of the Farm Nuisance Act be applied, barring this cause of action. And then the alternative that if the Farm Nuisance Act doesn't apply, that the order for injunctive relief be vacated because it's unsupported by the evidence of the trial.